953 So.2d 502 (2007)
THE FLORIDA BAR, Complainant,
v.
Steven Ray BROWNSTEIN, Respondent.
No. SC04-2460.
Supreme Court of Florida.
March 29, 2007.
*503 John F. Harkness, Jr., Executive Director and Kenneth Lawrence Marvin, Director of Lawyer Regulation, The Florida Bar, Tallahassee, FL, and Carlos Alberto Leon, Bar Counsel, The Florida Bar, Miami, FL, for Complainant.
*504 Richard Baron of Baron and Associates, Miami, FL, for Respondent.
PER CURIAM.
We have for review a referee's report recommending that Steven Ray Brownstein be found guilty of professional misconduct and suspended from the practice of law for three years. We have jurisdiction. See art. V, § 15, Fla. Const.
Brownstein pled guilty to all rule violations and stipulated to the following facts:
1. Respondent is and was at all times material herein a member of The Florida Bar, albeit suspended by an order of emergency suspension dated November 8, 2004, and subject to the jurisdiction and disciplinary rules of the Supreme Court of Florida.
2. On or about August 26, 2004, a subpoena duces tecum was duly executed and served upon Steven Ray Brownstein, Esquire, commanding him to appear before [The Florida Bar's] staff auditor on September 14, 2004, at 10:00 a.m. at the offices of The Florida Bar and produce at that time original bank statements, canceled checks, check stubs, deposit slips, wire transfers, cashier's checks issued with supporting documentation, receipt and disbursement journals, client ledger cards, HUD-1 statements for all real estate transactions, closing statements from any personal injury case, bank and client reconciliations from the account identified as Steven R. Brownstein, maintained at Union Planters account # XXXXXXXXXX (Operating), and any other trust account in which he has signatory capacity and any other account in which the funds pertaining to Mobilestop were placed, for the period of January 1, 2003, to the present. In addition, a subpoena was also issued to the banking institution.
3. The request for an audit was predicated upon the complaint of James P.E. Roen, Esquire, a partner with Respondent in the firm of Levey, Airan, Brownstein, Shevin, Friedman, Roen & Kelso, LLP. Mr. Roen stated that Respondent failed to disburse client's funds that were entrusted to him, specifically $20,000.00 from a settlement of $80,000.00 received by Respondent in October 2003, regarding a corporation identified as Strax.
4. In January 2004, Respondent issued from the bank account identified as Steven R. Brownstein, maintained at Union Planters Bank account # XXXXXXXXXX (Operating), two checks in the amount of $10,000.00 each payable to Alan Goldberg Trustee and identified the disbursements as "Strax Settlement." Those two checks were dishonored by the bank due to non-sufficient funds.
5. On or about April 2, 2004, Alan L. Goldberg (the Trustee), Chapter 7 Trustee for the estates of Mobilestop Com, Inc., filed a "Motion of Alan L. Goldberg, Chapter 7 Trustee (I) To Compel Compliance With Settlement and Compromise or, in the Alternative, For Entry of Judgment Against Defendants for the Settlement Balance and (II) For Order to Show Cause as to Why Attorney Steven R. Brownstein Delivered Two Worthless Checks to the Trustee."
6. On September 14, 2004, Respondent failed to appear or produce to The Florida Bar any of the records identified in the Bar's subpoena.
7. On or about October 14, 2004, Union Planters Bank delivered the bank statements, canceled checks and items deposited from account # XXXXXXXXXX (Operating), for the period of January 1, 2003, to April 30, 2004, and the account *505 identified as Steven R. Brownstein, Trust Account # XXXXXXXXXX (Trust), for the period of January 1, 2003, to July 31, 2004.
8. On October 15, 2003, the beginning balance in Respondent's trust account # XXXXXXXXXX (Trust), was $50.30. On the same day, Respondent deposited a check from Great American Insurance Companies in the amount of $40,000.00, payable to Steven R. Brownstein Trust, regarding the insured Strax Holdings, Inc.
9. These funds were used by Respondent in the following manner:

 DATE CK# PAYEE AMOUNT REFERENCE
 10-16-03 889 Levey, Airan, Brownstein $5,000.00 Strax
 10-22-03 890 Steven Brownstein 6,500.00 No reference
 10-22-03 891 Steven Brownstein 6,500.00 No reference
 10-28-03 892 Steven Brownstein 2,600.00 No reference
 10-31-03 893 Steven Brownstein 1,500.00 No reference
 11-17-03 W/T Levey, Airan, Brownstein 17,500.00 Ocean Bk
 11-28-03 894 Steven R. Brownstein 212.00 Strax

10. On November 30, 2003, the balance in Respondent's trust account was $238.70. On December 15, 2003, Respondent issued another check in the amount of $238.00 to himself, leaving a balance in the trust account of $0.30. This was the last transaction recorded in this trust account.
11. Respondent was pressured by the Bankruptcy Trustee to repay $20,000.00 received on October 15, 2003, from the Strax settlement. On or about January 23, 2004, Respondent issued from account # XXXXXXXXXX (Operating), his check # 8546 in the amount of $10,000.00 payable to Alan Goldberg, Trustee and identified the disbursement as pertaining to "Strax." On January 23, 2004, the balance in Respondent's account # XXXXXXXXXX (Operating) was an overdraft in the amount of $8,524.89.
12. On February 9, 2004, check # 8546 in the amount of $10,000.00 was presented to the bank for payment and was dishonored due to insufficient funds. The balance in the account on February 9, 2004, was $184.82.
13. On or about January 30, 2004, Respondent issued from account # XXXXXXXXXX (Operating), his check # 8547 in the amount of $10,000.00 payable to Alan Goldberg, Trustee and identified the disbursement as pertaining to "Strax." On January 30, 2004, the balance in Respondent's account # XXXXXXXXXX (Operating) was $220.11.
14. On February 9, 2004, check # 8547 was presented to the bank for payment and was dishonored due to insufficient funds. The balance in the account on February 9, 2004, was $184.82.
15. From March 10, 2003, to April 27, 2004, Respondent's bank account # XXXXXXXXXX (Operating) had checks presented thirty (30) times to the bank and dishonored due to insufficient funds.
16. The following transactions between Respondent's two accounts revealed [the law firm of Levey Airan Brownstein, et al. is referred to as "L.A.B."]:

 BANK
 DATE TRANSACTION DEPOSITS PAYMENTS BALANCE
 01-07-04 Ck 8539 L.A.B. $ 3,000.00 ($ 3,315.63)
 01-09-04 From L.A.B. 3,500.00 7.30
 01-14-04 From L.A.B. 4,000.00 ( 2,637.89)
*506
 01-15-04 Ck 8545 L.A.B. 2,300.00 ( 5,266.89)
 01-16-04 From L.A.B. 3,000.00 ( 2,324.89)
 01-20-04 From L.A.B. 3,300.00 975.11
 01-23-04 Ck 8549 L.A.B. 9,500.00 ( 8,524.89)
 01-26-04 From L.A.B. 8,640.00 86.11
 01-27-04 Ck 8550 L.A.B. 6,284.00 ( 6,197.89)
 01-28-04 From L.A.B. 6,630.00 403.11
 01-29-04 Ck 8551 L.A.B. 8,874.00 ( 8,470.89)
 01-30-04 From L.A.B. 9,000.00 220.11
 02-03-04 Ck 8557 L.A.B. 11,000.00 ( 12,545.15)
 02-04-04 From L.A.B. 12,700.00 96.85
 02-05-04 From L.A.B. 2,800.00
 02-05-04 Ck 8559 L.A.B. 14,000.00 ( 11,132.15)
 02-06-04 From L.A.B. 14,500.00 438.85
 02-10-04 Ck 8561 L.A.B. 14,788.00
 02-10-04 Bank dishonored check 8561 14,788.00 68.82
 02-12-04 Ck 8562 L.A.B. 8,898.00
 02-12-04 Bank dishonored check 8562 8,898.00 39.82
 02-19-04 Ck 8564 L.A.B. 9,500.00
 02-19-04 Bank dishonored check 8564 9,500.00
 02-19-04 Ck 8565 L.A.B. 3,500.00
 02-19-04 Bank dishonored check 8565 3,500.00 10.82

17. Every check issued or deposited from/or to Levey Airan Brownstein, et. al., was signed by Respondent. In February, 2004, Union Planters Bank dishonored checks issued by Respondent if the account did not have sufficient funds to cover it.
18. Based upon the foregoing, Respondent has violated Rule 4-8.4(c) (A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), of the Rules of Professional Conduct; and Rule 5-1.1(a) (Nature of Money or Property Entrusted to Attorney), Rule 5-1.1(b) (Application of Trust Funds or Property to Specific Purpose), Rule 5-1.1(e) (Notice of Receipt of Trust Funds; Delivery; Accounting), Rule 5-1.2(b) (Minimum Trust Accounting Records), Rule 5-1.2(c) (Minimum Trust Accounting Procedures), and Rule 5-1.2(d) (Record Retention) of the Rules Regulating Trust Accounts.
At the final hearing, the parties presented evidence pertaining to aggravating and mitigating circumstances. At this hearing, counsel for the Bar called Carlos Ruga, its staff auditor. Ruga explained how Brownstein used the two checking accounts involved: his operating funds account and his trust fund. As to Brownstein's operating funds account, from January 2003 until June 2003, Brownstein bounced checks on thirty occasions. Ruga also testified that Brownstein commingled the funds from his operating account with his trust funds account. He would then deposit money from his operating account into his trust fund account. While Ruga asserted that Brownstein used the Strax trust fund money for his personal use, Ruga was unable to perform a complete audit as to the trust account because Brownstein did not produce all of the records, including the client ledger cards and journals.
As his first witness, Brownstein called Dr. John Eustace, who had an extensive history performing mental health evaluations. Dr. Eustace first saw Brownstein in late December 2004, after the Bar grievance proceedings began. In his opinion, Brownstein had a "seriously advanced major depressive disorder." Brownstein met seven out of nine criteria for major depressive disorder and eighteen out of the twenty-one *507 criteria on the Beck's Depression Scale. He further asserted that this disorder was recurrent, affecting three different periods of Brownstein's life. The prior episodes did not last as long, however, and were less serious. Based on his diagnosis, Dr. Eustace recommended that Brownstein become involved in a comprehensive program of mental health treatment, including medication, individual treatment, and family treatment. Dr. Eustace last saw Brownstein shortly before testifying and stated it was his opinion that there was marked improvement, including his observations that Brownstein was no longer exhibiting suicidal ideations, had more energy, was beginning to interact with family and friends, and was willing to face the consequences of his bad acts. Dr. Eustace's opinion was that the misconduct was a symptom of the disorderthat "but for" the depression, he would not have committed the acts.
Brownstein then called Myer Cohen, the Executive Director of Florida. Lawyers Assistance (FLA), who discussed how FLA supervises the attorneys who have signed contracts with them. As his third witness, Brownstein called Tod Aronovitz, one of his long-time friends. Aronovitz testified that he noticed that there was a period of several years where Brownstein was not as happy as usualthat he was more serious or melancholy than usual. In December 2004, Brownstein talked to Aronovitz about the problems he was having. Aronovitz never would have guessed Brownstein could have a problem with the Bar because Brownstein had a very high reputation in the legal community and was regarded as an honest person. Although Aronovitz was not familiar with all of the charges against Brownstein, he asserted that any misconduct was an anomalyBrownstein devoted his entire life to doing things right.
Next, Brownstein called Ester Sardina, his executive assistant and former secretary. When she first started working for him, Brownstein was upbeat and generous, a good boss and person. However, around May 2000, he changed. He started asking her to hold his calls and would shut the door and lie on his couch. He would show up for work later and later. Although this behavior appeared rarely at first, it progressed and became more frequent. Clients would complain to her that he was not returning their calls. When she walked into the office, he was frequently asleep on his couch with his light off. In fact, the behavior was so obvious that the other secretaries kidded her about what an easy job she had since her boss just slept. Brownstein paid her salary himself, and a few times the checks bounced. Sardina also learned that Brownstein failed to pay to the government the withholding taxes from her salary. Brownstein also did not pay the payroll taxes which were owed for Sardina's social security benefits. Through the date of the hearing, these payments still were not made.
Brownstein was the final witness. He first detailed his thirty-one years as an attorney. Although there were times in his life when he was not "functioning on all cylinders," Brownstein did not admit his condition or seek medical treatment until after the Bar began its investigation in 2004. The last episode of the depression lasted for a significant period and got progressively worse until it was a struggle to come to his office at all. He tried to work but could not function, so he would lie down and sleep for hours. Rather than confront the problem, he withdrew further.
Brownstein discussed the misconduct relating to the Strax matter first. While he was generally in a depressed mood during this time, there were times when he was "up" for a few days, until his mood took *508 another down-turn. Brownstein explained how during one of his great lucid moments, he convinced the client that his firm had the ability to defend the Strax case. The client chose Brownstein as its attorney, and Brownstein helped settle the matter for $80,000, which was significantly less than the high six-figure amount initially sought by the trustees. Brownstein was also able to get the insurance company to assume half of the coverage. The client paid $40,000, which went into the firm trust account, and the insurance company paid the other $40,000, which went into the Brownstein trust account. Brownstein paid the trustee the $40,000 that was in the firm trust account and then paid the trustee $20,000 from the Brownstein trust account, leaving $20,000 due. Brownstein, however, used this money for personal uses. When the trustee asked about the remaining funds due, Brownstein lied, telling the trustee that the money had not come in yet but that he would pay it himself if there was any problem recovering it. After months passed, the trustee filed a motion to compel settlement. Brownstein borrowed the missing money from a long-time friend and then gave a cashier's check to the trustee, who withdrew the motion to compel settlement.
When he was asked whether he had ever used trust account money before, Brownstein testified that he remembered taking a client's funds once in the 1990s and then putting the money back into the trust account. From the period of 2000 through 2004, he did use trust account funds for his own use, although he could not recall on how many occasions this occurred. When he did take out any money, Brownstein stated that he put it back again, and no client ever complained or lost money.
When asked why he did this, he told the court that he had no excuse but that he was not mentally healthy during the time. He then explained how different he was from his normal self and how his depression affected all aspects of his life. When asked whether his motive in taking the money was selfish or dishonest, Brownstein replied, "I don't think so. I don't believe so. Dishonest, I guess, is a relative term. By taking it, I knew that it was improper. So I can't say." He denied that he was trying to deprive his client of any money, asserting that he could have easily borrowed the money from a number of people to pay back the money.
Brownstein also addressed the charges of check kiting, explaining that even though he had two different accounts, one personal and one for the firm, the firm's account was basically all his because the other partner had a different account. He explained that he would write a check, thinking that he had money coming in. When the money did not come in sufficiently to cover the checks he had already written, the bank called him, asking for him to cover it, so he would write a check from his other account. Brownstein admitted that he knew he did not have the money in the account at that time. During the five-week period in question, he used this as a mechanism when he was short of funds to solve the problem until he got the money. The bank charged him fees for the bounced checks, and since the money eventually came in, he asserted that the bank "was not out" any money. The bank never closed his accounts because of this problem.
Brownstein also admitted to other misconduct that was not charged. Brownstein had not filed income tax returns for the years 2000, 2003, and 2004. He also failed to pay his secretary's IRS taxes. At the time of the hearing, Brownstein asserted that he was attempting to rectify the IRS problem by hiring a certified public accountant to prepare the necessary documents *509 to resolve the problems regarding his delinquent taxes and his secretary's withholding taxes. Brownstein also admitted that he failed to give the Bar all of the records they needed and asserted that he did not have any client ledger cards and journal. While Brownstein recognized that he knew he should have a client ledger, he testified that he did not have a high volume of clients with trust fund money only about thirty clients over four years so it was simpler not to have one. Brownstein explained that the reason why he failed to turn over all of his records when they were first subpoenaed was because at that time, Brownstein was avoiding anything that could be a conflict, including requesting money from his friends. He did not want to take any affirmative action, even though he knew that by not acting, the consequences would be far worse. Brownstein further asserted that he believed this was the same reason why he failed to file his tax returnshe was not emotionally ready to sit down and think about those matters.
At the time the misconduct began, Brownstein was grossing up to $20,000 to $25,000 a month. In fact, a couple of years before, Brownstein made up to approximately $600,000 a year on several occasions. This income subsequently dropped to $150,000. Brownstein explained that even though he was in a deep depression, he was still able to make a relatively high salary because he did a lot of nominal work for one client that did not take a lot of concentration. In addition, based on his good reputation in the community, he also had referrals on a regular basis. He later learned, however, that because he was not getting all this work done, his firm starting pulling work from him.
Brownstein asserted that at the time of the hearing, he was feeling much better, although he recognized that he was still not completely himself. He was now taking medication and saw a professional once a week. Brownstein expressed his remorse, telling the referee that he felt as bad as one could feel because he knew that he had let down his family, his good friends who referred cases to him, and the Bar as a whole. Brownstein did not believe that this type of misconduct would occur in the future because he was better able to recognize the problem and he would not avoid treatment. At the same time, he also admitted that he needed more treatment before he could begin to practice law again.
The referee issued a written recommendation and report which found Brownstein guilty of the following rule violations: rule 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) and rule 4-8.4(d) (a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice) of the Rules of Professional Conduct; and rule 5-1.1(a) (Nature of Money or Property Entrusted to Attorney); rule 5-1.1(b) (Application of Trust Funds or Property to Specific Purpose); rule 5-1.1(e) (Notice of Receipt of Trust Funds; Delivery; Accounting); rule 5-1.1(f) (Disputed Ownership of Trust Funds); rule 5-1.2(b) (Minimum Trust Accounting Records); rule 5-1 (Minimum Trust Accounting Procedures); and rule 5-1.2(d) (Record Retention) of the Rules Regulating Trust Accounts. The referee found two aggravating circumstances: a pattern of misconduct and multiple offenses. She found ten mitigating circumstances: an absence of a prior disciplinary record; an absence of a dishonest or selfish motive; timely good faith effort to rectify the consequences of the misconduct; full and free disclosure to the disciplinary board and a cooperative attitude towards the proceeding; an otherwise good reputation and character; mental impairment; *510 interim rehabilitation; the imposition of other penalties and sanctions; remorse; and FLA supervision. The referee then recommended a three-year suspension, to be followed by five years of probation with numerous conditions.
The Bar challenges this recommendation, asserting that the referee erred as to certain findings in aggravation and erred in recommending a suspension. Particularly, the Bar challenges whether the referee erred in failing to find three aggravating factors: a dishonest or selfish motive; a bad-faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency; and substantial experience in the practice of law.[1] We agree with the Bar.
First, the referee did not find that Brownstein had a dishonest or selfish motive and, to the contrary, found that Brownstein's lack of dishonest motive was a mitigator. We disagree with the referee's conclusion. In this case, the factual underpinnings of this claim were uncontested. Accordingly, this Court is faced with only one question: whether the unchallenged facts support the referee's legal conclusion relative to a selfish motive. While this Court generally defers to a referee's findings of fact, "where there are no genuine issues of material fact and the only disagreement is whether the undisputed facts constitute unethical conduct, the referee's findings present a question of law that the Court reviews de novo." Fla. Bar v. Pape, 918 So.2d 240, 243 (Fla.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 1632, 164 L.Ed.2d 335 (2006).
The underlying acts supporting this aggravator are that Brownstein used funds in a trust account for his own personal use and then lied about it. When he was confronted by the trustee about the missing trust funds, Brownstein lied and told the trustee that he had not yet received the money, knowing at the time that this statement was dishonest and that he had already used those funds. Brownstein also wrote checks between his two accounts, knowing that he did not have the money to cover the checks. Brownstein defends his conduct by asserting that his depression affected his decision-making. While this may be a mitigating factor as to the appropriate discipline, it does not change the fact that Brownstein knowingly acted in a dishonest manner by taking money entrusted to him and lying about his actions to the trustee. Accordingly, we find that the referee erred with regard to this aggravator.
The Bar also asserts that the referee erred in failing to find the aggravating circumstance relative to whether Brownstein obstructed the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency. We agree with the Bar. Again, the facts are undisputed: Brownstein completely failed to produce any records for the Bar during the entire proceeding. Brownstein asserts that he did not comply because when the records were first subpoenaed, he was at the height of his depression and was unable to comply. Accepting that he was clinically depressed when the subpoena was first issued, Brownstein's depression did not extend through the entire *511 period in question so as to excuse his noncompliance with the process. After the Bar began its investigation, Brownstein sought help and began recovering from his depressive episode. Despite his recovery, to this date, he has not produced the necessary records for the Bar and admits that he failed to keep necessary records, including the required client ledgers. As the Bar's auditor testified during the evidentiary hearing, it was extremely difficult, if not impossible, to determine the extent of Brownstein's misconduct based on the lack of records. When questioned about the misappropriation, Brownstein was unable to state how many times he misappropriated funds. Brownstein's failure to maintain appropriate records does not excuse his complete disregard of a valid subpoena. We require members of the Florida Bar to comply with rule 5-1.2 (Trust Accounting Records and Procedures) of the Rules Regulating the Florida Bar, and we sanction noncompliance. See Fla. Bar v. Davis, 577 So.2d 1314 (Fla.1991) (imposing a ninety-day suspension for failing to maintain the minimum trust account records relating to a transaction where attorney was clearly handling funds that a client had entrusted to the attorney). Accordingly, we hold that the referee should have found that this aggravating circumstance applied.
Third, we find that the referee erred in failing to find the "substantial experience in the practice of law" aggravator. In this case, Brownstein had practiced law for thirty-one years. The referee, however, did not mention this aggravating circumstance at all. Accordingly, the referee should have applied the aggravating factor set forth in standard 9.22(i) (substantial experience in the practice of law) of the Florida Standards for Imposing Lawyer Sanctions.
The final issue we must address is whether the referee erred in her recommendation of a three-year suspension. As this Court has held:
In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because ultimately it is the Court's responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, § 15, Fla. Const. However, this Court will not generally second-guess the referee's recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions.
Fla. Bar v. Heptner, 887 So.2d 1036, 1041-42 (Fla.2004). We have repeatedly recognized not only the seriousness of the offense in respect to the individual client but also the extreme detriment to the public's confidence in the members of the Bar when a lawyer intentionally takes funds held in trust for the lawyer's own use. Such misconduct necessarily must result in the severest of sanctions. Under both the Florida Standards for Imposing Lawyer Sanctions and under existing caselaw, disbarment is presumed to be the appropriate sanction. See Fla. Stds. Imposing Law. Sancs. 4.11; Fla. Bar v. McFall, 863 So.2d 303, 308 (Fla.2003); Fla. Bar v. Travis, 765 So.2d 689, 691 (Fla.2000); Fla. Bar v. Tillman, 682 So.2d 542, 543 (Fla.1996). In limited instances, we have allowed this presumption to be rebutted but only by showing substantial mitigating circumstances which demonstrate that the presumed sanction of disbarment would be unfair and inappropriate in a particular case. See, e.g., McFall, 863 So.2d at 303; Fla. Bar v. Tauler, 775 So.2d 944 (Fla. 2000). We do not find in this case that the referee's recommending less than the presumed sanction of disbarment has a reasonable *512 basis in existing caselaw and the Florida Standards for Imposing Lawyer Sanctions.
Brownstein asserts that under our caselaw a lesser sanction is warranted in his case because of the severe depression which interfered with his ability to make ethical judgments and that this was completely out of character for him. Moreover, he contends that his misconduct did not harm any client, law firm, or financial institution. We do not agree. Based upon our review, we find that the cases which have approved a sanction less than disbarment for misappropriation of client trust funds were based either upon less culpability in the taking of the funds[2] or substantially more mitigation.[3]
Brownstein has been a successful lawyer who received very substantial financial benefits from the practice of law involving sophisticated legal services. Yet, during this time, he misappropriated his clients' money and breached their trust. We recognize that Brownstein and Dr. Eustace testified that during this period of time, Brownstein suffered from clinical depression. We accept the referee's finding that Brownstein's depression was established as a mitigating factor. However, we find it significant that Brownstein did not seek medical or psychological care until after the Bar's investigation began. Unlike the facts in McFall, when Brownstein took money from the trust account, he was not on medication that clouded his judgment. Further, after he saw Dr. Eustace and began to take medication, Brownstein still did not undertake to provide the Bar with the subpoenaed records, cooperate with the Bar in reconstructing records, or rectify his wrongful acts of failing to pay his secretary's withholding taxes and payroll taxes or his own back taxes.
As we have repeatedly stated, disbarment is the presumed sanction for the misappropriation of client funds, and the presumption will be overcome only in unique circumstances. This case involves five substantial aggravators: (1) a dishonest or selfish motive; (2) bad faith obstruction of the disciplinary proceedings; (3) substantial experience in the practice of law; (4) multiple offenses; and (5) a pattern of misconduct. In contrast to this weighty aggravation, eight mitigators circumstances are present: (1) an absence of a prior disciplinary record; (2) timely good-faith effort to rectify consequences of misconduct; (3) otherwise good reputation and character; (4) mental impairment; (5) interim rehabilitation; (6) imposition of other penalties and sanctions; (7) remorse; and (8) FLA supervision. While we acknowledge the referee's findings regarding the mental depression suffered by Brownstein, we find that the mitigation is insufficient to overcome the presumption of disbarment based upon our caselaw. As we do not find Brownstein has overcome the presumption, we conclude that the appropriate discipline in this case is disbarment.
Based on the above, we approve the referee's findings of fact and recommendations as to guilt. However, as noted above, we reject certain findings pertaining to the aggravating and mitigating circumstances, and further reject the recommended discipline. For the reasons addressed above, we find that the mitigation *513 in this case does not outweigh the seriousness of the offenses and instead order disbarment. Accordingly, Brownstein is hereby disbarred for a period of five years, effective nunc pro tunc, November 8, 2004, the effective date of the suspension in Florida Bar v. Brownstein, 888 So.2d 623 (Fla.2004) (table). Because Brownstein has been suspended since November 8, 2004, it is unnecessary to provide him with thirty days to close out his practice of law to protect the interests of existing clients.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida XXXXX-XXXX, for recovery of costs from Steven Ray Brownstein in the amount of $11,625.16, for which sum let execution issue.
It is so ordered.
WELLS, PARIENTE, QUINCE, and BELL, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which CANTERO, J., concurs.
LEWIS, C.J., recused.
ANSTEAD, J., concurring in part and dissenting in part.
I disagree with the majority only with respect to its rejection of the discipline recommended by the referee. Primarily because of the mental health issues involved, I would approve the referee's recommendation of a lengthy suspension followed by an extended term of probation.
CANTERO, J., concurs.
NOTES
[1] The Bar further asserts that the referee made additional errors in her findings of fact relating to the other aggravating circumstances. For example, the Bar alleged that the Court should consider as additional aggravation that Brownstein failed to file his personal income tax return and failed to pay his secretary's withholding taxes. These allegations, however, were not charged in the case and are not considered by the Court. If there are later charges by the Bar relevant to this alleged misconduct, the Court will consider such acts at that time.
[2] See Fla. Bar v. Mason, 826 So.2d 985 (Fla. 2002) (misappropriation due to accounting error).
[3] See, e.g., Tauler, 775 So.2d at 947-48 (husband's operations had caused loss of his medical practice, bankruptcy, and loss of family home, resulting in a period of emotional distress); McFall, 863 So.2d at 308 (during period of misappropriation, attorney was in extreme pain due to neuropathy and prescribed medication clouded his judgment).