PER CURIAM.
We have for review a referee’s report recommending that Respondent Mark Enrique Rousso and Respondent Leonardo Adrian Roth be found guilty of professional misconduct. The referee recommended sanctions of a twelve-month suspension for Rousso and a fifteen-month suspension for Roth. We have jurisdiction. See art. V, § 15, Fla. Const. We approve the referee’s findings of fact. We approve the referee’s recommendations as to guilt, except we disapprove the referee’s recommendation that Respondents be found not guilty of violating Rule Regulating the Florida Bar 5-l.l(a)(l) (Trust Account Required; Commingling Prohibited). For the reasons discussed herein, we disapprove the referee’s recommended sanctions of suspension and, instead, impose disbarments. We also disapprove the referee’s “equitable adjustment,” which reduced the amount of costs awarded to The Florida Bar.
FACTS
On January 5, 2011, The Florida Bar filed separate complaints against Respondent Mark Enrique Rousso (Case No. SC11-15) and Respondent Leonardo Adrian Roth (Case No. SC11-16). On that same date, the Bar filed a motion for consolidation. The cases were referred to a referee, who granted the motion for consolidation. The referee held hearings and made the following findings and recommendations.
The referee found that “100’s of millions of dollars passed through” the trust account of Respondents’ firm. The parties agreed that by the end of 2008 the measure of trust account imbalance was roughly $4.38 million. Respondents claim that Fernando Horigian, the firm’s non-lawyer bookkeeper (“Bookkeeper”), embezzled the *760 $4.38 million. The referee found that no clear and convincing evidence established that Respondents misappropriated the $4.38 million or received any dii’ect benefit from the disappearance of the funds. Further, the referee reported that when the deficiencies in the account were discovered, “Respondents endeavored to honor every known client liability for trust account funds.”
Roth learned of the trust account deficiencies in April of 2008, but he did not fully comprehend the cause and scope of the problem until several months later. Rousso became aware of the trust account problem in December of 2008. From that point, Respondents took several actions to address the financial shortages, which included: (1) hiring outside counsel; (2) hiring an outside accountant and conducting an informal audit; (3) funding the trust account deficit from many sources; (4) contacting police and cooperating with the ensuing investigation; and (5) explaining the situation by telephone to the Bar via the ethics “hotline.” The Florida Bar asserts that Respondents’ actions were “too little, too late.”
The trust account deficits were covered by the firm’s malpractice insurer, credit lines, Respondents’ personal funds, funds borrowed from family, and money borrowed from a client, Mr. Hattim Kais Yor-di (“Yordi”). Roth solicited Yordi for a personal loan. Yordi traded a portion of his trust account credit for a “promissory note amounting to over $231 thousand.” Although Rousso did not solicit this loan to cover the trust account shortfall, he did benefit by the exchange of the promissory note for the trust account liability. Respondents defaulted on the promissory note. The firm has disbanded and Respondents testified that they are insolvent.
Minimum Standards, Rule 5-1.2. The referee has recommended that this Court find Respondents guilty of violating Rules Regulating the Florida Bar 5-1.2(b) (Minimum Trust Accounting Records) and 5-1.2(c) (Minimum Trust Accounting Procedures), which set forth the required minimum standards for the maintenance of trust accounts. There is clear and convincing evidence that Respondents violated these rules by failing to: (1) examine endorsed checks to ensure against possible forgery; (2) prepare and maintain memo-randa to support the legitimate disbursement of trust funds to Respondents’ interests or business concerns (disbursements occurred at a time when the account could not cover client liabilities); (3) prepare and maintain a separate file or ledger for each client or matter showing individual receipts, disbursements, or transfers and any unexpended balance; and (4) cause a monthly reconciliation of the trust account to be made so that it could be compared to the total of the trust ledger cards or pages, together with specific descriptions of any differences between the two totals and reasons therefore.
The referee noted that Bookkeeper and his family allegedly fled to Argentina. His whereabouts are unknown. Respondents claim that the criminal acts of Bookkeeper could not be anticipated or thwarted. Although Respondents’ argument might hold true for an isolated and recent theft of trust funds, the massive amount of the $4.38 million deficit proves that Bookkeeper had been embezzling for months or even years. The referee found that if Respondents had adhered to the minimum standards required by the Bar rules, they would have been safeguarded against embezzlement. The pattern of theft could have been exposed before damage extended beyond the second month. Clearly, the ultimate responsibility for trust account funds rests with the attorneys. A lawyer’s responsibility for *761 safekeeping of trust account funds cannot be delegated to a non-lawyer employee of the firm. Misappropriation by office staff does not relieve the lawyer from the requirements of the minimum standards regarding a trust account.
Commingling, Rule 5-l.l(a)(l). To cover the deficits in the trust account, Respondents used personal funds, funds borrowed from family, money borrowed from a client, funds from credit lines, and proceeds related to a claim against the firm’s malpractice insurer. These funds were personal to Respondents. Trust accounts are reserved for client funds related to lawyer representation and should not be used as a repository for a lawyer’s own property. See R. Regulating Fla. Bar 5-1.1(a)(1) (Trust Account Required; Commingling Prohibited). Despite this evidence, the referee recommended that Respondents be found not guilty of violating rule 5-1.1. However, the referee found that Respondents’ decision to fund the trust account with personal funds resulted in other acts of misconduct.
Conflict of Interest; Current Clients, Rule 4-1.7. After April 2008, Respondents deposited money other than client funds into the trust account. Also, they decided who received disbursements from the trust account and when funds were disbursed. The referee found that certain trust payees benefitted by Respondents’ “preference for early payment,” while other payees had to wait longer. In addition, there was “galling evidence” that Respondents distributed earned trust money to the firm’s operating account before distributing funds to clients. Thus, Respondents had conflicts of interest in representing their clients. The referee stated that no client should ever have cause to question the order of disbursements from an underfunded trust account. Some clients received trust funds sooner or later. For other clients, Respondents covered client trust account liabilities from non-trust account sources. Further, Yordi’s trust account credit was traded for a promissory note. Despite the conflicts of interest between Respondents and their clients as to how and when clients would receive preference in payment, Respondents continued to represent them.
Respondents could have continued representing these clients if the affected clients had given their informed consent. However, Respondents did not inform the clients that Bookkeeper had embezzled their money. Instead, Respondents decided to quietly cover the losses. Thus, the majority of clients were not advised of the situation and they did not provide their informed consent. As a mitigating factor, the referee found that Respondents sought to pay the trust account clients the amounts that belonged to them or provide them with a promissory note in lieu of the trust account liability.
Conflict of Interest; Prohibited and Other Transactions, Rule 4-1.8. Ordinarily, parties to a business negotiation are adverse and at arm’s length -with each other. Parties to negotiations have no duty to advise on whether the deal is fair to the other, so caveat emptor is the general rule. However, the attorney/client relationship necessitates an exception to the general rule. Roth had asked client Yordi for a loan. Yordi traded a portion of his trust account credit for a promissory note. This created a conflict of interest between Respondents and their client, Yordi. A lawyer, as a negotiating party with a client for a loan, is a lawyer first. Lawyers have advantages. They possess legal skills and training beyond those of their clients. They benefit by the clients’ expectation of loyalty and consequent trust. These advantages create the possibility that lawyers, in business transactions with their *762 clients, will overreach. The Bar rules address these concerns. Lawyers are not to enter into a business transaction with their clients unless the requirements of rule 4-1.8(a) are met. Rule 4-1.8(a) requires that:
(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer’s role in the transaction, including whether the lawyer is representing the client in the transaction.
Both Respondents benefitted by the loan, yet neither Respondent transmitted in writing to Yordi that: (a) funds from outside sources were needed to cover embezzling from the trust account; (b) the measure of trust account imbalance was unknown (the investigation was still ongoing and Respondents were covering deficits as they emerged); (e) there was a risk that the firm might not survive the calamity and consequently a risk whether Respondents could pay back any loan; (d) Yordi should engage an independent lawyer for legal advice on the transaction; and (e) the loan could not consummate unless the client gave his informed consent.
Conduct Involving Dishonesty, Fraud, Deceit, or Misrepresentation, Rule 4-8.4(c). The Bar asserts that Respondents engaged in misconduct involving dishonesty, fraud, deceit, or misrepresentation and thereby violated rule 4-8.4(c). With regard to the conduct that created conflicts of interest, the referee found that Respondents breached an affirmative duty to disclose the true conditions and advise their clients to seek informed consent. The referee recommended that this Court find Respondents guilty of violating rule 4-8.4(c). Their breach gave clients the false impression that financial matters were stable, when such matters clearly were not in a proper state. The referee found that Respondents’ conduct was dishonest, fraudulent, deceitful, and a type of misrepresentation, when they continued representing clients, and continued taking clients’ money and depositing it into the trust account, when Respondents knew the account was seriously underfunded. Also, the referee has recommended that Respondents be found guilty of violating rule 4-8.4(c) for taking new money into the trust account to pay older client liabilities while knowing that such action was only a delay tactic. Eventually, an unfunded payout would be due on the new money. The referee has further recommended that the Court find Respondents guilty of violating rule 4-8.4(c) for engaging in business transactions with a client at a time when there was a possibility — a possibility that was realized — that it would be difficult if not impossible to repay the debt owed to Yordi.
Recommendations as to Guilt
The referee recommended that Respondents be found not guilty of violating rule 5-1.1 (Trust account; commingling). The referee recommended that they should be found guilty of violating rules 5-1.2 (Trust accounting records and procedures); 4-1.7 (Conflict of interest; current clients); 4-1.8 (Conflict of interest; prohibited and other transactions); and 4-8.4(c) (Conduct involving dishonesty, fraud, deceit, or misrepresentation).
*763 Determining the Appropriate Sanction
The referee found the enormous amount of the missing trust funds to be an aggravating factor. As the referee noted, but for the portion covered by the firm’s malpractice insurance earner and another portion covered with personal funds deposited by Respondents, the potential injury to clients would have totaled approximately $4.38 million.
In addition, the referee found that Respondents were incorrect in asserting that the entire $4.38 million deficit had been covered. Yordi loaned Respondents over $231,000 (by trading a portion of his trust account credit for a promissory note), which was used to cover the trust account shortage. Thereafter, Respondents defaulted on the loan from Yordi.
The funds from client Yordi present a serious breach of conduct. The referee found that Roth did not know the extent of the loss when he solicited Yordi for the loan. Further, Roth thought the firm would be able to repay the loan.
Respondents brought themselves to financial ruin by trying to correct the harm that Bookkeeper caused. The referee found Respondents’ efforts to cover client trust account liabilities to be a mitigating factor.
Recommended Disciplinary Sanction
The referee recommended that Rousso be suspended from the practice of law for twelve months and Roth be suspended for a period of fifteen months. Because Respondents were suspended pursuant to this Court’s orders imposing emergency suspensions on November 8, 2010, the referee recommended that the suspensions be effective nunc pro tunc, December 8, 2010, which is the effective date of the emergency suspensions. The referee stated that the difference in the recommended suspensions, twelve months for Rousso and fifteen months for Roth, is based on the fact that Roth solicited and procured the loan from Yordi.
As a condition for reinstatement, the referee recommended that Respondents must show evidence of full satisfaction and release of Yordi’s claim, with each Respondent responsible for half of the claim. Further, the referee awarded costs of $39,806.23 to The Florida Bar.
On Review
The Bar filed a petition for review of the report of referee, challenging the referee’s recommendation that Respondents be found not guilty of violating rule 5-1.1, the referee’s recommended sanctions of suspensions instead of permanent disbar-ments, and the referee’s reduction in the amount of costs awarded to the Bar. Respondents filed a cross-petition for review in which they challenge the referee’s recommendations that they be found guilty of violating rule 4-8.4(c).
ANALYSIS
First, The Florida Bar challenges the referee’s recommendation that Respondents should be found not guilty of violating rule 5-1.1 (Trust accounts). In reviewing a referee’s recommendations regarding guilt, the Court has stated that the referee’s factual findings must be sufficient under the applicable rules to support the recommendations as to guilt. See Fla. Bar v. Shoureas, 913 So.2d 554, 557-58 (Fla.2005).
Rule 5-l.l(a) addresses commingling and provides:
(a) Nature of Money or Property Entrusted to Attorney.
(1) Trust Account Required; Commingling Prohibited. A lawyer shall hold in trust, separate from the lawyer’s ovm property, funds and property of clients or third persons that are in a lawyer’s *764 possession in connection with a representation. All funds, including advances for fees, costs, and expenses, shall be kept in a separate bank or savings and loan association account maintained in the state where the lawyer’s office is situated or elsewhere with the consent of the client or third person and clearly labeled and designated as a trust account. A lawyer may maintain funds belonging to the lawyer in the trust account in an amount no more than is reasonably sufficient to pay bank charges relating to the tmst account.
(Emphasis added.) The record clearly demonstrates that Respondents knowingly engaged in commingling, which violates rule 5 — 1.1(a)(1). They placed their personal funds and loans from others into the trust account. By April 2008, Respondents had deposited $245,600 in personal funds to cover the account shortages. Further, on June 20, 2008, Rousso and Roth each deposited checks in the amount of $100,000 into the trust account. In July 2008, Yordi allowed Roth to use $231,223.68 of Yordi’s trust account funds as a personal loan. Roth used Yordi’s funds to address the shortages in the trust account. All of these deposits into the trust account constitute commingling. Despite these facts, which are in the record, the referee stated:
The decision to fund the trust account with personal funds did not offend the basic principles underlying the commingling proscription. The Respondents’ decision was founded on a sense of personal honor to make right the wrong wrought by the bookkeeper.
The referee found that Respondents “sense of personal honor” to correct the theft of funds justified the commingling. Case law, however, does not support the referee’s conclusion. In Florida Bar v. Cox, 718 So.2d 788 (Fla.1998), the respondent was found guilty of violating numerous Bar rules, including rule 5-1.1(a) for commingling. Id. at 791, n. 1. The respondent had received a business loan for $200,000 that he had wired into his trust account. In Florida Bar v. Brownstein, 953 So.2d 502 (Fla.2007), the respondent was found guilty of violating eight Bar rules, including rule 5-1.1(a). The respondent bounced checks on thirty occasions. To cover these checks, Brownstein, like Respondents, transferred other funds into the trust fund. Brownstein deposited funds from his operating account into his trust account. He was found guilty of violating rule 5-l.l(a) for commingling. Id. at 509, 512. Accordingly, because the record here does not support the referee’s recommendation, we disapprove the referee’s recommendation that Respondents be found not guilty of violating rule 5-1.1. We find Respondents guilty of violating rule 5-1.1 for commingling funds.
Second, Respondents contend that the referee violated their due process rights by recommending that they be found guilty of violating rule 4-8.4(c). They cite In re Ruffalo, 390 U.S. 544, 550-51, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), for the proposition that during Bar proceedings, an attorney is entitled to procedural due process, which includes fair notice of a charge so that an opportunity is afforded to him to form an explanation and defense. Respondents admit that the Bar alleged violations of rule 4-8.4(c) in the complaints, but they claim that the asserted violations only applied to the allegations of misappropriation. On this basis, Respondents argue that the referee has recommended that they be found guilty of violating rule 4-8.4(c) for matters that were not pled or argued by the Bar.
Respondents’ due process arguments are misleading. The Bar’s complaints set forth the alleged facts, which were the *765 basis of these disciplinary cases. After presenting those facts, the Bar stated the rules Respondents allegedly violated at the end of the complaints. The complaints included rule 4-8.4(c). Thus, Respondents are incorrect when they claim that the complaints’ allegations regarding violations of rule 4-8.4(c) only applied to misappropriation. The complaints did not limit the consideration of rule 4-8.4(e) solely to possible misappropriation.
The Court has specifically held that “[t]here is no requirement for the Bar to connect every alleged item of misconduct to a specific rule violation.” Fla. Bar v. Committe, 916 So.2d 741, 745 (Fla.2005). Rather, the Bar is required to set forth the particular acts of conduct for which the attorney is sought to be disciplined. Id.; see also R. Regulating Fla. Bar 3-7.6(h)(1)(B) (Pleadings; Complaint; “Content. The complaint shall set forth the particular act or acts of conduct for which the attorney is sought to be disciplined.”). In this case, the Bar’s complaints specifically addressed the conduct it ultimately relied upon to prove that Respondents had violated their professional obligations, and the complaints included allegations that the conduct violated rule 4-8.4(c).
The determinative due process issue is whether Respondents were on notice of the nature and extent of the charges pending against them and had an opportunity to be heard. See Committe, 916 So.2d at 745; Fla. Bar v. Fredericks, 731 So.2d 1249, 1254 (Fla.1999). In Florida Bar v. Nowacki, 697 So.2d 828, 832 (Fla.1997), the Court stated:
We find that the conduct referenced by the referee in his report in this case, though not specifically pled in the Bar’s complaint, was clearly within the scope of the Bar’s accusations and respondent was clearly notified of the nature and extent of the charges pending against her.
(Emphasis added.) Here, the Bar’s complaints clearly notified Respondents of the nature and extent of the charges pending against them (which includes the conduct that the referee has recommended be found as violations of rule 4 — 8.4(c)), and Respondents had the opportunity to defend themselves. Accordingly, the referee did not violate Respondents’ due process rights because the allegations of misconduct and violations of rule 4-8.4(c) were pled in the complaints or were “clearly within the scope of the Bar’s accusations.” Nowacki, 697 So.2d at 832. We approve the referee’s recommendations that Respondents be found guilty of violating rule 4-8.4(c).
Third, the Bar challenges the referee’s recommended disciplinary sanctions of a twelve-month suspension for Rousso and a fifteen-month suspension for Roth. The Bar asserts that the appropriate discipline is permanent disbarment. In reviewing a referee’s recommended discipline, this Court’s scope of review is broader than that afforded to the referee’s findings of fact because, ultimately, it is the Court’s responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also Art. V, § 15, Fla. Const. However, generally speaking, this Court will not second-guess the referee’s recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999).
In Florida Bar v. Riggs, 944 So.2d 167 (Fla.2006), the respondent engaged in various misdeeds, including misconduct regarding client funds, acts involving dishonesty and misrepresentation, and violations of trust account requirements. In part, Riggs failed to properly manage his trust *766 account and he failed to manage the activities of his paralegal. Due to his failure to abide by the trust account rules and manage the trust account, the paralegal allegedly stole a portion of the trust account funds. Riggs, like Respondents, did not properly fulfill his responsibilities as an attorney regarding the trust account. He did not exercise the necessary care and discretion. Both Riggs and Respondents permitted non-attorney employees to handle the trust accounts without proper management by an attorney. Riggs was sanctioned with a three-year suspension.
Similarly, in Florida Bar v. Whigham, 525 So.2d 873, 874-75 (Fla.1988), the respondent was found grossly negligent in managing a trust account. The facts demonstrated that the respondent did not misappropriate the client funds. For failing to properly manage the trust account, the respondent received a three-year suspension. Id. at 875.
In light of Riggs and Whigham, we find that the referee’s recommended suspensions of twelve and fifteen months do not have a reasonable basis in existing case law. We disapprove the referee’s recommended sanctions.
The Bar argues that the appropriate sanctions for Respondents are permanent disbarments. The cases cited by the Bar in support of this argument involve misappropriation by the attorneys. Further, most of those cases resulted in disbarment, not permanent disbarment. See, e.g., Fla. Bar v. Martinez-Genova, 959 So.2d 241, 249 (Fla.2007) (the respondent was disbarred for misappropriating third-party funds and failing to maintain proper trust account procedures); Fla. Bar v. Brownstein, 953 So.2d 502, 512-13 (Fla.2007) (the respondent was disbarred for misappropriating client funds); Fla. Bar v. Graham, 605 So.2d 53, 56 (Fla.1992) (the respondent was disbarred for misappropriation of client funds). In this case, the referee specifically found that there was no clear and convincing evidence that Respondents misappropriated any of the $4.38 million. Further, the referee found that “[t]he bookkeeper alone caused those deficits” and Bookkeeper’s “embezzlement caused the injuries that followed.” Therefore, cases involving misappropriation are not on point.
In addition, the Court has stated that “permanent disbarment is warranted [ ] where the conduct of a respondent indicates that he is beyond redemption.” Fla. Bar v. Carlson, 183 So.2d 541, 542 (Fla.1966). Here, the referee found that “Respondents have extended themselves to financial ruin in an effort to make right the wrong done by the bookkeeper. Accordingly, to the credit of the Respondents, efforts to cover client trust account liabilities counts as a mitigator.” Based on the unique facts in this case, we find that disbarments, rather than permanent dis-barments, are the appropriate sanctions.
Like the respondents in Riggs and Whigham, Respondents failed to properly manage the trust account. As the referee stated, “Respondents cannot abdicate, by delegation to the bookkeeper, the ultimate responsibility for trust account maintenance .... ” Their failure to exercise care and discretion in managing the trust account resulted in a massive theft of client funds—approximately $4.38 million was stolen from the account. If Respondents had adhered to the minimum trust account requirements set forth in the Rules Regulating the Florida Bar, they could have safeguarded their clients from this enormous amount of theft. While recognizing Respondents’ argument that the funds had been stolen by Bookkeeper, the referee concluded that this argument might hold for an isolated and recent conversion of *767 trust funds, but the sheer size of the $4.38 million deficit proves that Bookkeeper had been embezzling for many months, if not years. Respondents had tried to delegate their responsibilities to a non-lawyer employee in the firm, and did not effectively monitor the employee or the trust account. As the referee noted, the ultimate responsibility for the trust account monies rests with Respondents. They are the lawyers. See Fla. Bar v. Watson, 76 So.Sd 915, 923 (Fla.2011) (attorneys are responsible for managing the trust accounts). In Florida Bar v. Ward, 599 So.2d 650 (Fla.1992), the Court stated that lawyers have a “unique fiduciary duty,” individually and as a profession. “Never is an individual’s trust in attorneys more evident, or more at risk, than when he places funds or property into the hands of his attorney.” Id. at 652. Respondents abandoned their professional duty to safeguard their clients’ funds.
Next, once Respondents were aware of the financial shortages in the trust account, it took them an excessive length of time to seriously deal with the issues. Although Roth learned of the trust account deficiencies in April of 2008, Rousso was supposedly unaware of the problem until December of 2008. Yet the record shows that by April 2008, Respondents had deposited $245,600 in personal funds to cover the account shortages and that in June 2008 Respondents each deposited $100,000 checks into the trust account. Further, in July 2008, Roth used the $231,223.68 personal loan from Yordi to shore up the trust account. Respondents were not properly handling Bookkeeper’s theft of $4.38 million. As the record demonstrates, their actions were a tactic to delay the inevitable and, as the referee found, “[eventually, an unfunded payout would be due.”
Further, the actions that Respondents took to manage the drastic shortages in the trust account included additional acts of misconduct. Respondents accepted funds from clients when Respondents knew the account was underfunded. This was a conflict of interest. They did not inform clients of the firm’s financial issues when dealing with them, yet they continued to represent the clients. In addition, they were using this “fresh money” from some clients to satisfy past due client liabilities.
Also, Roth solicited the personal loan from client Yordi, which was a conflict of interest, and Respondents used those personal funds to bolster the trust account, which was commingling. Respondents engaged in additional acts of commingling by repeatedly depositing their personal funds into the trust account.
Respondents also committed violations of rule 4 — 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation) by taking money from clients and depositing it into the trust account, and continuing to represent those clients, without disclosing to the clients that the trust account was seriously underfunded. They also violated rule 4-8.4(c) by engaging in the business transaction with client Yordi at a time when they knew it would be difficult if not impossible to repay the debt to him. The Court does not view violations of rule 4-8.4(c) as minor. The Court has clearly stated that “basic, fundamental dishonesty ... is a serious flaw, which cannot be tolerated.” Fla. Bar v. Rotstein, 835 So.2d 241, 246 (Fla.2002).
After considering case law and the egregious misconduct present in this case, we conclude that disbarments are the appropriate sanctions.[1]
*768 When discussing the referee’s recommended sanction, Respondents challenge the referee’s recommendation that their readmission be conditioned upon full repayment of the loan from their client, Yor-di. They contend that their business arrangement with Yordi is a civil matter that should not be addressed in this disciplinary case. We disagree. Rule 3-10.1(c)(3) of the Rules of the Supreme Court Relating to Admissions to the Bar requires applicants seeking admission to The Florida Bar to demonstrate that they “conduct financial dealings in a responsible, honest, and trustworthy manner.” In addition, rule 3-11(g) provides that conduct which is disqualifying for admission includes “financial irresponsibility.” Therefore, we approve the referee’s recommendation that Respondents must demonstrate that they have fulfilled their settlement agreement with Yordi before they can be readmitted to membership in The Florida Bar.
Finally, the Bar challenges the referee’s reduction in the amount of costs awarded to the Bar. Before the referee, the Bar sought costs totaling $70,826.23, which were set forth in an itemized statement of costs. After considering Respondents’ objection to the Bar’s request for payment of costs, the referee applied an “equitable adjustment” and awarded reduced costs of $39,806.23 to the Bar. The referee’s equitable adjustment was an abuse of discretion.
Respondents argued that the Bar was “seeking reimbursement for a fixed cost,” which was the hours worked by the Bar’s Staff Auditor. Respondents asserted that because the Staff Auditor is a salaried employee, they should not have to pay for the significant time he had to devote to working on their cases. Respondents are misguided. Staff Auditor costs are specifically taxable under rule 5-1.2(f). Further, as the Bar notes, the audit was time-consuming and costly because Respondents delayed in providing the proper trust account records. The referee had to order them to comply. Also, the records that were provided were doctored and flawed, which Respondents attribute to Bookkeeper’s efforts to conceal his misdeeds; nevertheless, these facts caused the audit and investigation to require additional time and effort. Plainly stated, the cost of the audit is due to Respondents’ own actions — they failed to abide by the Bar rules regarding trust accounts and they failed to properly provide the required information. As the Court stated in Florida Bar v. Lechtner, 666 So.2d 892, 894-95 (Fla.1996), “[t]he choice is between imposing the costs of discipline on those who have violated our Rules of Professional Conduct or on the membership of the Bar who have not. In these situations, it is only fair to tax those costs against the member who has violated the rules.” (Citations omitted.)
Before the referee, Respondents also argued that they were unable to pay the Bar’s costs. This argument is not a basis to reduce an award of costs. In Lechtner, the Court specifically concluded that it is “an abuse of discretion for the referee not to assess costs against [the] guilty respondent” based on the respondent’s inability to pay the Bar’s costs. (Emphasis added.) *769 “[B]ut for [the attorney’s] misconduct, there would have been no complaint and, thus, no costs.” Fla. Bar v. Miele, 605 So.2d 866, 868 (Fla.1992). In the present case, the referee’s determination that the Staff Auditor costs should be reduced as an “equitable adjustment” was an abuse of discretion and contrary to the Court’s case law.
We disapprove the referee’s adjustment of costs and, instead, award the Bar its costs of $70,826.23.
CONCLUSION
Accordingly, we approve the referee’s findings of fact and recommendations as to guilt, except we disapprove the referee’s recommendation that Respondents be found not guilty of violating rule 5-1.1(a)(1). We find Respondents guilty of violating the rule. Also, we disapprove the referee’s “equitable adjustment” in the amount of costs awarded to The Florida Bar. Further, we disapprove the referee’s recommended sanctions of suspension. Respondent Mark Enrique Rousso and Respondent Leonardo Adrian Roth are hereby disbarred. The disbarments are effective nunc pro tunc, December 8, 2010, the effective date of the emergency suspensions. Because Respondents are already suspended, they do not need thirty days to close down their practices to protect the interests of existing clients. Respondents shall fully comply with Rule Regulating the Florida Bar 3-5.1(h). Further, Respondents shall accept no new business until Respondents are readmitted to The Florida Bar.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Respondent Mark Enrique Rousso and Respondent Leonardo Adrian Roth in the amount of $70,826.23, with each Respondent being responsible for payment of half of the total costs, for which sum let execution issue.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Disbarments are also supported by Florida Standards for Imposing Lawyer Sanctions 5.11(f) (disbarment is appropriate when a lawyer engages in any other intentional con *768 duct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice); 6.11(b) (disbarment is appropriate when a lawyer improperly withholds material information and causes serious or potentially serious injury to a party); and 7.1 (disbarment is appropriate when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional, with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system).