# Supreme Court of Florida

————————

No. SC15-2004

————————

**THE FLORIDA BAR,**
Complainant,

vs.

**RANDALL LAWRENCE GILBERT,**
Respondent.

[March 22, 2018]

PER CURIAM.

We have for review a referee's report recommending that Respondent, Randall Lawrence Gilbert, be found guilty of professional misconduct and suspended from the practice of law for a period of two years. We have jurisdiction. *See* art. V, § 15, Fla. Const. The egregious facts, as found by the referee, demonstrate Gilbert's failure to exercise any supervision over Steven Sacks, Gilbert's employee with a known history of wire fraud and embezzlement of more than $7 million. Even after Gilbert was warned by Sacks' probation officer of the risk of financial irresponsibility and his opinion that Sacks should not be working at a law firm given his criminal past, Gilbert did nothing. In fact,

shortly after hiring Sacks, when Gilbert became aware that Sacks had embezzled over $20,000 from the law firm's operating account, Gilbert fired and then rehired Sacks, eventually delegating to Sacks all matters regarding the administration of Gilbert's firm's trust account. The details are set forth more fully below, but by the end of 2014 Sacks had embezzled nearly $5 million from the firm's trust account.

Whether Gilbert was aware of or personally involved in the theft is not the critical inquiry. Indeed, this case gives new meaning to the phrase "turning a blind eye." Gilbert, as an attorney and fiduciary, was directly responsible for his firm's trust account and for the supervision of employees. As an attorney, he owed a duty to the public and to his clients to safeguard their money. Instead, he flouted the system by lying to a federal probation officer and allowing a nonattorney to hold himself out as a law school graduate and a certified public accountant (CPA). Sacks was neither and never had been. For the reasons that follow, we approve the referee's factual findings and recommendation as to guilt but reject the referee's recommended disciplinary sanction and, instead, impose the sanction of disbarment.

## FACTS

In February 2005, Sacks was referred to Gilbert by a friend/client for a job at Gilbert's law office. Gilbert interviewed Sacks and learned that Sacks was then

living in a halfway house, having been recently released from federal prison after being convicted of wire fraud. Sacks claimed in this interview to be a CPA and a disbarred New York attorney. With knowledge of Sacks' criminal history, Gilbert hired Sacks. However, Gilbert did not investigate Sacks' criminal history in any manner, obtain any further information about Sacks' crimes, contact the New York Board of Accountancy to confirm whether Sacks was a CPA, or contact the New York Bar in regard to the circumstances of Sacks' disbarment.

On or about April 8, 2005, Sacks' federal probation officer, Jeffrey Feldman (Officer Feldman), met with Gilbert. During the meeting, Gilbert signed a "PROB 32" form, formally acknowledging the risk of hiring Sacks as well as some aspects of the crimes Sacks had committed. The PROB 32 form indicated that on "December 23, 2002," Sacks was convicted of 11 counts of "wire fraud" and was sentenced to "41 months imprisonment, followed by a total of five (5) years [probation, and ordered to pay] [r]estitution in the amount of $7,906,332.14." Officer Feldman also told Gilbert that he felt it was inappropriate for Sacks to be working at a law firm given Sacks' history of fraud and embezzlement.

The referee found that with respect to Sacks' past, Gilbert was "curiously uncurious." Had Gilbert investigated Sacks further, he would have discovered that Sacks was never an attorney in New York. Additionally, if Gilbert had contacted the New York Board of Accountancy, he would have learned that Sacks was not a

CPA.  The referee notes Gilbert's "failure to exercise even a modicum of due diligence with respect to Sacks' 'resume,' a resume which came with a number of bright red flags attached to it."  Additionally, Gilbert permitted Sacks to identify himself as holding a "J.D.," which was printed on business cards and included in his signature on firm emails.

Five months after Gilbert hired Sacks, Sacks stole and forged Gilbert's signature on one of the firm's operating account checks, writing the check for $20,950 to pay for Sacks' girlfriend's cosmetic surgery.  Upon Gilbert's discovery of the theft, Sacks returned the check.  Gilbert terminated Sacks' employment, but did not report the incident to Officer Feldman.  When he learned Sacks had been terminated, Officer Feldman repeatedly reached out to both Sacks and Gilbert in an attempt to determine why Sacks was no longer employed at the firm.  Gilbert refused to tell Officer Feldman why he terminated Sacks.  Officer Feldman was surprised by Gilbert's refusal to cooperate, especially since Gilbert was a member of The Florida Bar.

On October 11, 2005, Sacks called Officer Feldman and explained that he and Gilbert had reconciled and that Sacks had returned to working for Gilbert.  On October 19, 2005, Officer Feldman visited Gilbert's office and expressed surprise regarding Sacks' rehiring and disappointment for Gilbert's failing to respond to his attempts at communication.  When questioned about his lack of communication

with Officer Feldman, Gilbert apologized but stated that "he did not discuss employee matters with anyone." Gilbert went on to tell Officer Feldman that Sacks' termination was due to "a misunderstanding." Additionally, Gilbert informed Officer Feldman that Sacks would continue working with the firm in the same capacity as he previously had, as a bookkeeper, but failed to inform Officer Feldman when he delegated more responsibility to Sacks following his return. In fact, Gilbert eventually named Sacks as the Chief Financial Officer of Gilbert's firm.

The referee found that Gilbert refused to be truthful with Officer Feldman regarding Sacks' termination because he realized that Sacks' conduct would have probably violated Sacks' probation. Indeed, Officer Feldman testified that had Gilbert informed him of the crimes committed by Sacks, the crimes would have been reported to the presiding court to initiate revocation of Sacks' probation, resulting in Sacks' return to prison. Ultimately, the referee concluded that "[h]ad Gilbert been honest, the incidents that led to this proceeding would not have occurred."

According to the referee's report, Sacks' thefts likely began at or around the time Sacks' federal probation ended. Gilbert's main focus of his practice before he met Sacks, and continuing thereafter, was construction litigation. The real estate closing side of Gilbert's practice began between 2006 and 2007, but did not

- 5 -

exponentially grow until the mortgage foreclosure crisis in 2008. Sacks was the head of Gilbert's team of closers for the law firm and aggressively established relationships in the real estate community. Gilbert allowed Sacks full rein over the real estate closing side of his practice. Gilbert was not aware that Sacks was paying Gilbert's employees thousands of dollars from the firm's trust account in order to perpetuate his scheme of embezzlement. Sacks would transfer the funds that were deposited into the firm's trust account to pay off the remaining mortgages after the closings of the sales of the firm's clients' properties to a shell company, which he created, and then continue to keep the mortgages "alive" by making the monthly payments, so that no one would know of his thefts.

Nothing in the record suggests that Gilbert engaged in any type of meaningful post-closing supervision or follow-up of Sacks' actions. Gilbert testified that he reviewed monthly three-way comparisons prepared by Sacks, which reconciled the bank account and trust account funds. He also reviewed the first and last page of the bank account statements. He testified that this review took no more than two to four minutes per month. There was also testimony presented that every bank statement, with the exception of two, from February 2010 through March 2014 reflect at least one theft by Sacks.

The referee found clear and convincing evidence that Gilbert delegated all matters regarding the administration of the firm's trust account to Sacks, including

preparing trust account reconciliations, acting as the firm's contact person and intermediary with the trust account reviews by Old Republic, Gilbert's title insurance underwriter, and dealing with the firm's CPA. Gilbert did not review the information Sacks provided to the CPA. The referee concluded that "[b]undling all of [the] financial responsibilities in the hands of someone convicted of wire fraud, and who [Gilbert] knew had attempted to steal $20,950 from him without serious repercussion, displayed a remarkable lack of proper supervision."

Over time, Sacks' lifestyle improved significantly. Gilbert believed Sacks' girlfriend financed this lifestyle, as she was the beneficiary of a sizable trust. Sacks also told Gilbert that he had some real estate investments.

Sacks' scheme was first discovered on February 27, 2014, when Gilbert received a call from an attorney asking why the attorney's client's mortgage was paid and kept alive for three months after it should have been satisfied. While this event prompted Gilbert to investigate, Gilbert chose not to close the firm's trust account. Between February 27, 2014, and March 11, 2014, when Gilbert did finally close the firm's trust account, Sacks stole an additional $95,000.

Sacks' thefts from Gilbert's trust account first appear in the trust account bank statement for the period February 27, 2010, through March 31, 2010. Sacks created a fake corporation, SQWERTY, to which almost $4 million of the illicit transfers were made. The record shows that over a 49-month period from February

2010, through March 2014, Sacks stole $4,750,708.70 from Gilbert's trust account. Of that amount, $4,542,410.70 benefited Sacks and other third parties to whom he gave stolen trust account funds. The difference, according to the Bar, $208,298.03, benefitted Gilbert's law firm.

Old Republic was the single largest victim of Sacks' thefts, paying out $3,612,374.10 in title insurance claims. Gilbert himself lost approximately $1 million when Sacks failed to pay off the original mortgage on Gilbert's home when he and his wife refinanced it.

Gilbert took numerous steps to ameliorate the damage caused, which included meeting with the bank to close the firm's trust account, hiring a forensic accountant to complete an accounting, reporting the thefts to appropriate law enforcement agencies, restricting Sacks' online access to any aspect of the law firm, suing his bank to get whatever funds might still be left in Sacks' accounts, notifying his malpractice carrier, and self-reporting to The Florida Bar. Gilbert also declined to receive paychecks from the firm for a significant period of time and dedicated the net profit to his firm from closings to reimbursing those who had suffered losses. In all, Gilbert paid off about $1.03 million to individuals suffering losses as a result of Sacks' thefts.

The referee's report found Gilbert guilty of violating multiple Rules Regulating the Florida Bar including: Bar Rules 3-4.3 (Misconduct and Minor

Misconduct), 4-1.3 (Diligence), 4-5.3(b) (Responsibilities Regarding Nonlawyer Assistants–Supervisor Responsibility), 4-5.3(c) (Responsibilities Regarding Nonlawyer Assistants–Ultimate Lawyer Responsibility), 4-8.4(c) (Misconduct–Conduct Involving Dishonesty, Fraud, Deceit, or Misrepresentation), 5-1.1(a) (Trust Accounts–Nature of Money or Property Entrusted to Attorney), 5-1.1(b) (Trust Accounts–Application of Trust Funds or Property to Specific Purpose), 5-1.2(b)(6) (Trust Accounting Records and Procedures–Minimum Trust Accounting Records), 5-1.2(c)(1) (Trust Accounting Records and Procedures–Responsibility of Lawyers for Firm Trust Accounts and Reporting) and (2), 5-1.2(d) (Trust Accounting Records and Procedures–Minimum Trust Accounting Procedures). However, the referee concluded that disbarment was not the appropriate sanction in this case and instead, recommended that Gilbert be suspended for two years and placed on probation for two years after being reinstated, along with paying the costs of The Florida Bar and other conditions.

The Florida Bar filed a petition in this Court challenging the referee's recommended sanction, arguing that disbarment is appropriate. Gilbert filed a cross-petition challenging both the referee's findings as to guilt with respect to Bar Rules 3-4.3, 4-1.3, 4-8.4(c), 5-1.2(b)(6), and 5-1.2(c)(1) and the referee's recommended sanction, arguing that the punishment was excessive and this Court should instead impose a suspension lasting anywhere from six months to one year.

On September 27, 2017, this Court issued an order to show cause directing Gilbert to show cause why he should not be suspended from the practice of law pending the final disposition of this case. Both Gilbert and The Florida Bar filed responses. After considering the responses, this Court suspended Gilbert until the resolution of this case.

**ANALYSIS**

First, we reject without further discussion Gilbert's arguments that the referee erred in finding him guilty of violating Bar Rules 3-4.3, 4-1.3, 4-8.4(c), 5-1.2(b)(6), and 5-1.2(c)(1).

As for the appropriateness of the recommended sanction, the Bar contends that Gilbert should be disbarred, while Gilbert conversely contends that a suspension from six months to one year would be appropriate. The standard of review for a referee's recommendation as to discipline is as follows:

> In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because, ultimately, it is the Court's responsibility to order the appropriate sanction. *See Fla. Bar v. Anderson*, 538 So. 2d 852, 854 (Fla. 1989); *see also* art. V, §15, Fla. Const. However, generally speaking, this Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing caselaw and the [Florida] Standards for Imposing Lawyer Sanctions. *See Fla. Bar v. Temmer*, 753 So. 2d 555, 558 (Fla. 1999).

*Fla. Bar v. Ratiner*, 46 So. 3d 35, 39 (Fla. 2010).

The referee's recommended sanction in this case is a two-year suspension. In making his recommendation, the referee found four aggravating factors: a pattern of misconduct; multiple offenses; the vulnerability of the victim; and substantial experience in the practice of law. The most significant of these factors was that the misconduct spanned over four years, during which time Gilbert failed to properly supervise an employee whom he knew to have a criminal past. The referee found eight mitigating factors: absence of a prior disciplinary record; absence of dishonest or selfish motive; a timely good faith effort to make restitution or to rectify the consequences of the misconduct; full and free disclosure to the disciplinary board or a cooperative attitude toward the proceedings; good character or reputation; interim rehabilitation; the imposition of other penalties or sanctions; and remorse.

In relation to Gilbert's failure to supervise Sacks, the referee found Gilbert guilty of violating Bar Rules 4-1.3 (Diligence); 4-5.3(b) (Responsibilities Regarding Non-Lawyer Assistants–Supervisory Responsibility) and (c); 5-1.1(a) (Nature of Money or Property Entrusted to Attorney) and (b) (Application of Trust Funds to Specific Purpose); and 5-1.2(a) (Trust Accounting Records and Procedures–Applicability), (b) (Trust Accounting Records and Procedures–Minimum Trust Accounting Records), (c) (Trust Accounting Records and Procedures–Responsibility of Lawyers for Firm Trust Accounts and Reporting),

- 11 -

and (d) (Trust Accounting Records and Procedures–Minimum Trust Accounting Procedures). With respect to Bar Rules 4-1.3, 4-5.3(b), and 4-5.3(c), the referee found:

> When learning of the problem with the unsatisfied mortgage on February 7, 2014, [Gilbert] failed to act reasonably diligently and promptly by confronting Sacks to explain immediately why the mortgage had not been satisfied as required. . . . Sacks continued to come to work for six days thereafter yet [Gilbert] did little research of his own trust account records to determine what might have happened. . . .
> . . . .
> Sacks was a "confidence man," a "con man," to whom [Gilbert] was too willing to delegate, without properly supervising, the financial side of the law firm, especially the real estate closing side of the practice. . . .
> . . . .
> Clearly [Gilbert] did little more each month than have Sacks lead [his] eyes from one line on one of the documents to the next line on the next document that Sacks wanted [Gilbert] to see, obfuscating the entries Sacks did not want him to see, and [Gilbert's] review was done.
> Spending five more minutes each month on any one of the months in question, would have been a much more effective use of [Gilbert's] time.

With respect to Bar Rules 5-1.1(a) and (b), and 5-1.2(a), (b), (c), and (d), the referee found violations of these rules because the documents prepared by Sacks were "monuments to fraud," and accordingly could never comply with the applicable Bar Rules. Indeed, this is a logical conclusion because fraudulent documents could never serve the purpose of these rules—safeguarding client property—as evidenced by this case.

According to the referee's report, "The most serious and damaging aspect of [Gilbert]'s lack of supervision concerns his failure to properly supervise his trust account." We agree. From February 2010 through March 2014, Sacks stole approximately $4.8 million from Gilbert's firm's trust account. There were 190 thefts by Sacks, over four years, averaging over $100,000 per month, which appeared on almost every bank statement which, despite his monthly review, went unnoticed and unquestioned by Gilbert.

Gilbert testified that he spent no more than two to four minutes monthly reviewing the bank statements, the only documents which would have clearly shown the thefts by Sacks. The referee found that Gilbert "allowed Sacks full rein over the real estate closing side of the practice." Instead of dividing financial responsibility and accountability, Gilbert "allowed Sacks to be solely responsible for multiple facets of the law firm's finances," including balancing books, preparing QuickBooks and trust account reconciliations, performing the duties of officer manager, Chief Financial Officer, and comptroller, and acting as the intermediary between the firm's CPA, Old Republic, and Gilbert.

Indeed, Gilbert's lack of supervision extended to Sacks' representations to and interactions with Gilbert's clients. As previously stated, instead of investigating Sacks' claims that he was a CPA and disbarred New York attorney, Gilbert allowed Sacks to display both "J.D." and "CPA" on his business cards with

the firm and in his signature line in firm emails. Testimony presented at the disciplinary hearing indicated that these representations misled some of Gilbert's clients into thinking that Sacks was actually an attorney working for Gilbert's firm.

The referee found this lack of supervision to be an aggravating factor. Standard 4.41(c) states, "Disbarment is appropriate when . . . a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client." Gilbert's conduct over the four-year period displays a pattern of extreme neglect.

Equally as serious are Gilbert's acts of dishonesty in this case. With respect to Gilbert's dishonesty, the referee found Gilbert guilty of violating Bar Rules 3-4.3 (Misconduct and Minor Misconduct) and 4-8.4(c) (Misconduct–Conduct Involving Dishonesty, Fraud, Deceit, or Misrepresentation). With respect to these rule violations, the referee stated:

> [Gilbert], although the intended victim of theft and forgery, failed to be honest with Probation Officer Feldman when asked why Sacks had been terminated . . . . [Gilbert] knew that had he answered the probation officer's inquiries honestly Sacks would have been charged with violating supervised release and re-incarcerated. . . . Instead, [Gilbert] intentionally thwarted the probation officer from fulling his lawful function . . . .
> The argument that [Gilbert] had no legal obligation to be honest with the probation officer might be true for the "average citizen." However, the average citizen has not accepted the responsibility of being in a formal fiduciary relationship concerning the safeguarding of others' property.

The referee found that Gilbert fired Sacks after discovering his initial $20,000 theft from Gilbert's trust account. However, after sending Sacks to therapy, for which Gilbert paid, and determining that Sacks had been "rehabilitated," Gilbert rehired Sacks and proceeded to give him more control over the financial aspects of his firm. Incredibly, Gilbert testified during the disciplinary hearing that he lied to Sacks' probation officer, who attempted multiple times to ascertain the reason for Sacks' firing and rehiring, because he knew if he told the truth Sacks would be reincarcerated. Indeed, the referee found, and Officer Feldman testified that had Gilbert been honest with him regarding the incident, Officer Feldman would have revoked Sacks' probation, and the entire incident could have been avoided.

"This Court does not view violations of rule 4-8.4(c) as minor. . . . '[B]asic, fundamental dishonesty . . . is a serious flaw, which cannot be tolerated.' " *Fla. Bar v. Rousso*, 117 So. 3d 756, 767 (Fla. 2013) (quoting *Fla. Bar v. Rotstein*, 835 So. 2d 241, 246 (Fla. 2002)). The referee found Gilbert's dishonesty to the probation officer to be an aggravating factor. Standard 6.11(b) of the Florida Standards for Imposing Lawyer Sanctions is applicable and states: "Disbarment is appropriate when a lawyer . . . improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." Standard 5.11(f) is

also applicable, and it instructs that "[d]isbarment is appropriate when . . . a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

While the referee found that *Rousso* was not controlling, we consider *Rousso* to provide guidance in this case. In *Rousso*, a bookkeeper embezzled $4.38 million of the "100s of millions of dollars passed through" the respondents' trust account. *Id.* at 759. The evidence did not establish that the respondents misappropriated the funds, and the respondents "endeavored to honor every known client liability for trust account funds." *Id.* at 760. This Court ultimately found that disbarment, and not permanent disbarment, was the appropriate sanction. *Id.* at 769.

Gilbert's conduct was equally, if not more, egregious than that in *Rousso*. Gilbert hired and rehired a felon convicted of wire fraud, who had embezzled nearly $8 million. Gilbert never investigated the circumstances of Sacks' prior criminal conviction and never verified Sacks' assertions of his prior experience. He ignored the probation officer's warnings that Sacks should not be trusted in a position of financial responsibility. Then, shortly after his employment, Sacks stole from Gilbert and was rewarded by being reemployed and given more responsibility. Additionally, Gilbert lied to Officer Feldman, intentionally preventing Officer Feldman from, as the referee found, "fulfilling his lawful

function with the eventual harm to dozens of individuals and entities and the loss of approximately $4.8 million."

For these same reasons, we also find unpersuasive Gilbert's contention that a suspension ranging from six months to one year is appropriate. Gilbert relies upon *The Florida Bar v. Hines*, 39 So. 3d 1196 (Fla. 2010). However, *Hines* is not applicable here. *Hines* involved a one-time misappropriation of $128,802.68 that was immediately caught, and the person affected by the misappropriation was made whole. *Id.* at 1198. Here, there were more than 190 thefts, which took place over a four-year period, that totaled almost $5 million, and the largest creditor has yet to be made whole.

On the balance, although we do not ignore the mitigation found by the referee, we conclude that it does not outweigh the egregiousness of Gilbert's conduct. Given all of these circumstances, we conclude that the disciplinary sanction of disbarment is warranted and appropriately serves the three-pronged purpose of attorney discipline: (1) it is fair to society; (2) it is fair to the Respondent; and (3) it is severe enough to deter other attorneys from similar misconduct. *See Fla. Bar v. Lawless*, 640 So. 2d 1098, 1100 (Fla. 1994).

### CONCLUSION

Accordingly, Randall Lawrence Gilbert is hereby disbarred from the practice of law in the State of Florida. Because Gilbert is currently suspended, the

- 17 -

disbarment is effective immediately. Gilbert shall fully comply with Rule Regulating the Florida Bar 3-5.1(g).

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Randall Lawrence Gilbert in the amount of $32,884.03, for which sum let execution issue.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS DISBARMENT.

Original Proceeding – The Florida Bar

Joshua E. Doyle, Executive Director, Tallahassee, Florida, Adria E. Quintela, Staff Counsel, and Randi Klayman Lazarus, Bar Counsel, The Florida Bar, Sunrise, Florida,

for Complainant

David B. Rothman and Jeanne T. Melendez of Rothman & Associates, P.A., Miami, Florida,

for Respondent